The Hartford Steam Service Company et al. *v.*
John L. Sullivan, Tax Commissioner

Superior Court      Hartford County      File No. 139705

Memorandum filed April 25, 1966

*Robinson, Robinson & Cole,* of Hartford, for the plaintiffs.

*Harold M. Mulvey,* attorney general, *Walter T. Faulkner* and *Ralph G. Murphy,* assistant attorneys general, for the defendant.

Parskey, J. This is an appeal from the decision of the state tax commissioner holding the plaintiff The Hartford Steam Service Company, hereinafter referred to as Steam Service, or in the alternative the plaintiff The Hartford Gas Company, hereinafter referred to as Hartford Gas, subject to the tax imposed by § 12-264 of the General Statutes upon the gross earnings of Steam Service for the years 1962 and 1963.

Hartford Gas is a specially chartered public service company. At the 1961 session of the General Assembly, by amendment to its charter, it was "authorized and empowered, through the agency of one or more wholly owned subsidiary corporations, whether incorporated by special act of the general assembly or under the general statutes of the state of Connecticut, as well as by itself, to engage in the business of furnishing, from one or more plants, heat or air conditioning, or both, by means of steam, heated or chilled water or other medium." 30 Spec. Laws 94, § 2. Pursuant to this authority, Hartford Gas organized two wholly owned subsidiaries, The Hartford Steam Company, specially chartered, and Steam Service, organized under general law.

Steam Service is an unusual corporation. It owns no real or tangible personal property. It is supplied by Hartford Gas with both brain and brawn power. It has no employees of its own. Officers of Hartford Gas are also officers of Steam Service. Telephone calls are taken by employees of Hartford Gas. The personnel manager of Hartford Gas is also personnel manager of Steam Service. Tools and equipment utilized for Steam Service are owned by Hartford Gas. The building of which it is lessee and in which it conducts its business contains an exterior sign which reads "Hartford Gas Company Heating and Cooling Plant." Hartford Gas is the guarantor not only of the rent but also of the fulfilment of all covenants and conditions to be performed by Steam Service as lessee. Whatever else it may be, in economic reality Steam Service is the umbilical subsidiary of Hartford Gas.

In paragraph third of its certificate of incorporation, Steam Service was incorporated "to engage in the business of furnishing to the public from

one or more central plants, heat or air conditioning, or both, by means of steam, heated or chilled water, or other medium." Since it started in business in May, 1961, it has furnished steam heat and chilled water for cooling to a group of buildings in the central business district of Hartford. It has entered into thirty-year contracts whereby it has agreed to furnish and the purchasers have agreed to buy all of the purchasers' requirements for both heating and air conditioning. In 1962 Steam Service received $247,600, or 45.79 percent of its total gross earnings, from sale of steam, and $293,100, or 54.21 percent, for furnishing chilled water. In 1963 the corresponding figures are $436,100, or 41.24 percent, for steam, and $621,300, or 58.76 percent, for chilled water. Steam turbines are used in production of chilled water; the above figures do not reflect the use of steam for this purpose.

Section 12-264 in chapter 212 of the General Statutes imposes a tax on gross earnings of "each company, the principal business of which is manufacturing, selling or distributing gas or electricity or steam to be used for light, heat or power." Section 12-214 of the General Statutes, which imposed a tax on the net income of business corporations, specifically excludes companies subject to gross earnings taxes under chapter 212 and companies all of whose properties in this state are operated by companies subject to such gross earnings taxes. Hartford Gas is concededly subject to the gross earnings tax under chapter 212. In 1961 the General Assembly not only amended the charter of Hartford Gas as noted above and specially chartered The Hartford Steam Company (30 Spec. Laws 8) but also added "steam" to the commodities included in § 12-264. Public Acts 1961, No. 604, § 14.

## Tax Liability of Hartford Gas

There are two grounds on which liability may be imposed on Hartford Gas for gross earnings of Steam Service, namely (1) that Steam Service is an agency of Hartford Gas, and (2) that the operations of Steam Service are part of a single economic enterprise of Hartford Gas.

The first ground of liability is based on an interpretation of the 1961 amendments to the charter of Hartford Gas. 30 Spec. Laws 93–94. As a specially chartered corporation, Hartford Gas is limited to such powers as are specifically granted in its charter or necessarily implied from granted powers. The specific grant of certain powers is an implied prohibition of other and distinct powers. *New York Firemen Ins. Co.* v. *Ely*, 5 Conn. 560, 572 (1825). Prior to its 1961 charter amendment, Hartford Gas could not engage in the business of furnishing steam for heat or chilled water for air conditioning, nor could it subscribe for stock in a corporation which did engage in such business. *Mechanics & Working Men's Mutual Savings Bank & Building Assn.* v. *Meriden Agency Co.*, 24 Conn. 159, 162 (1855); *Byrne* v. *Schuyler Electric Mfg. Co.*, 65 Conn. 336, 347 (1895). The 1961 amendments granted Hartford Gas certain exclusive privileges, including the right to lay and maintain mains, pipes or other conduits in the public streets for the purpose of carrying the steam or chilled water. 30 Spec. Laws 94, § 2. Grants of exclusive privileges are construed strictly against the grantee. *State* v. *Towers,* 71 Conn. 657, 666 (1899); *New Hartford Water Co.* v. *Village Water Co.,* 87 Conn. 183, 189 (1913); *Spellacy* v. *American Life Ins. Assn.,* 144 Conn. 346, 352 (1957). The authority given Hartford Gas was to engage in the business of furnishing heat or air conditioning by means of steam,

heated or chilled water either by itself or "through the agency of one or more wholly owned subsidiary corporations." 30 Spec. Laws 94, § 2. There was no authority given Hartford Gas either to assign its franchise or to invest in a corporation not an agency of Hartford Gas. A corporation which accepts a legislative cake takes it with its legislative frosting. The court must presume, therefore, that when Hartford Gas organized Steam Service it intended to engage in the heating and air conditioning business through the agency of a wholly owned subsidiary.

The second ground for liability of Hartford Gas is based on the proposition that where the economic enterprise is one, the corporate forms being largely paper arrangements that do not reflect the business realities, the court should deal with the realities. *National Labor Relations Board* v. *Deena Artware, Inc.,* 361 U.S. 398, 403 (1960) ; Berle, "The Theory of Enterprise Entity," 47 Colum. L. Rev. 343. This is not the negative concept variously described as "piercing the corporate veil" or "disregarding the corporate fiction," a concept based on equitable principles and designed to frustrate fraud, misrepresentation or illegality. It is, rather, a positive principle, the effect of which is to remove judicial blinders so as to enable the court to see things as they really are. *Platt* v. *Bradner Co.,* 131 Wash. 573 (1924). Nor is it unrecognized in this state in the field of taxation. In *Stanley Works* v. *Hackett,* 122 Conn. 547 (1937), for example, the plaintiff was the sole owner of the stock of three Canadian corporations from which it received annual dividends. The question presented was whether these dividends were taxable to the plaintiff under the corporation business tax which taxed net income from business within the state. The court concluded (p. 554) that the plaintiff "made

use of the activities of these subsidiary corporations as essential parts of its business" and decided that the "dividends" were in fact income from operations outside the state and therefore not taxable. Applying the economic enterprise principle to the present case, it is clear that Steam Service is in fact, if not in fiction, the umbilical embryo of Hartford Gas. If Hartford Gas chooses or is obliged to conduct its operations as a single economic enterprise, it should not be surprised if the tax commissioner and the courts treat them the same way.

### LIABILITY OF STEAM SERVICE

The question involved here is whether the principal business of Steam Service is the manufacturing, selling or distributing of steam to be used for heat or power within the meaning of § 12-264 of the General Statutes (gross earnings tax). "Principal" is defined "most important, consequential, or influential"; Webster, Third New International Dictionary; and "[c]hief; leading; . . . . Highest in rank, authority, character, importance, or degree". Black, Law Dictionary (4th Ed.). The words "principal business" designate the companies and not the operations to be taxed. *State* v. *United Electric Light & Water Co.,* 90 Conn. 452, 456 (1916). The difficulty with dictionary definitions, these included, is that they merely spot locations; they are not road maps. None of these definitions, for example, suggest the criteria for determining what is or what is not a principal business. Is plant investment to be the sole criterion, or is it annual income or average annual income? A simple illustration will suffice. One may safely assume that revenue received by newspapers from the sale of advertising space far exceeds that derived from the sale of newspapers, and yet few people would suggest that the principal business of newspapers

is commercial advertising. Furthermore, the dictionary definition of "principal" would seem to preclude either equality or plurality; it suggests relative inequality, the idea of major and minor, one as opposed to many. By this definition, a company could have only one principal place of business. But contra, *Standard Oil Co.* v. *Commonwealth,* 110 Ky. 821, 823 (1901). One signpost may be an uncertain guide to a given destination, as any traveler in the state of New York will attest. Even annual receipts as the sole criterion do not provide a certain answer in the present case. In 1962, about 45 percent of the total receipts of Steam Service were allocated to steam; in 1963 this figure was 41 percent; but these allocations cover only steam furnished customers for heat. No allocation is made for steam used by Steam Service for power as an integral and indispensable part of its chilled-water operation. Adding up all the factors, the emphasis which the company itself has put on the word "steam" both in its certificate of incorporation and its business title, the obligation of the company to furnish steam to its customers as an essential part of each of the thirty-year contracts, the legislative history of the gross earnings tax, the annual receipts for steam furnished customers in 1962 and 1963, the use of steam by the company as a most important, consequential and significant source of power for the chilled-water operation, the court is persuaded that Steam Service is subject to the gross earnings tax imposed by § 12-264 of the General Statutes.

Although *Hartford Steam Service Co.* v. *Sullivan,* 151 Conn. 687 (1964), superficially would seem to call for a contrary result, a closer examination of that case shows no inconsistency with what has been said here. In that case, which involved the year 1961, the trial court found that "[t]he

sale and distribution of steam for heating and chilled water for air conditioning constitute the chief and dual business for which the plaintiff [Steam Service] was organized." A-435 Rec. & Briefs 253. Steam Service disputed this finding, contending that the use of the definite article in the statute precluded a finding of a dual principal business, and suggested two bases for determining principal business, namely, plant investment and gross receipts. A-435 Rec. & Briefs 263-65. The court ignored plant investment, presumably because there was no showing that Steam Service, as lessee, had invested any money in the plant and distribution systems. With respect to gross receipts, the evidence demonstrated that 75 percent of gross earnings for 1961 were attributable to steam. Thus, the fact that Steam Service was subject to the gross earnings tax for 1961 under its own ground rules does not preclude the court from considering other factors with a change of ball parks.

Judgment may enter in favor of the defendant dismissing the appeal.