[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Town of Wallingford ("Town"), appeals from a declaratory ruling issued as a final decision on August 30, 2000 by the Department of Public Health ("Department"). The declaratory ruling was sought pursuant to General Statutes § 4-176 and an appeal is permitted from the final decision pursuant to §§ 4-176 (h) and 4-183.
On March 6, 2000, the Town sought a declaratory ruling regarding the applicability of General Statutes § 25-32 et seq. to so called "town-owned, non-utility land." (Return of Record ("ROR"), Volume I, Exhibits-Hearing Officer 1, p. 15.) The Town sought a declaration as to whether land purchased by the Town, known as the Cooke property, is subject to the jurisdiction of the Department as "water company land" located on the public drinking water supply watershed. (ROR, Volume I, Exhibits-Hearing Officer 1, p. 17)[1]
By letter dated May 1, 2000, the Department agreed to hold a hearing on the Town's request. (ROR, Volume I, p. 107.) On July 19, 2000, a contested hearing was held before hearing officer Elizabeth Borrino. In a proposed decision dated August 7, 2000, the hearing officer found the following findings of fact:
 1. Petitioner is the Town of Wallingford, which is a municipality. . . .
 2. The Board of Public Utilities Commission ("the Commission") of the Town consists of three commissioners who are appointed by the Town mayor and confirmed by the Town Council ("the Council"). The [Commission[2]] has policy-making authority and oversees three divisions: water, electric, and sewer. The Council can override any action by the Commission. . . .
 3. The water division supplies water to two or more consumers or twenty-five or more persons on a regular basis. . . .
 4. Any land purchased by the water division must be acquired in the name of the Town pursuant to the Town Charter. When the water division discontinues CT Page 12345 use of a property, the use of such property reverts back to the Town. . . .
 5. The water division's funds are held in a separate account from that of the Town's general fund. There is no intermingling between these funds. The water division is self-sustaining and all monies received through its rates are utilized on behalf of the water division for providing services. The businesses and residents who are served by its operation pay for the water division's operation. Not all residents are connected to the Town's water supply system. . . .
 6. The mayor and the Council approve utility budgets. The Commission has no authority to develop budgets and operate the utility without approval of the mayor and the Council. . . .
7. The water division pays no taxes to the Town. . . .
 8. The water division does not have a separate personnel department. The Town's employees are assigned to the various divisions of the Town, including the water division. . . .
 9. The Town supplies insurance to the water division by purchasing a liability policy that covers and is apportioned to the water division. . . .
 10. Each of the Town's water, electric, and sewer divisions pays a proportionate share of the cost of their operations, including personnel and insurance. At the end of the year, each division pays its share, which is then recouped through the division's rates. . . .
 11. The water division is not a separate entity. It is a division that falls within the town government, as shown in the Town Charter. . . .
 12. On November 10, 1998, the Council enacted a funding Ordinance to purchase the property, which was approved by its Mayor, William Dickinson, Jr., on November 13, 1998. The property was purchased with the Town's general funds in January CT Page 12346 of 1999. No water division funds were utilized for the property's purchase. . . .
 13. The property was purchased for open space purposes or such other purposes as the Town may decide are necessary. . . .
 14. The property is located within the watershed of the South Central Regional Water Authority ("South Central"), which supplies the New Haven area with drinking water. The property is part of the watershed that protects South Central's source of drinking water. The property does not impact on the Town's water supply. . . .
 15. On May 21, 1999, Mayor Dickenson, on behalf of the Town, notified the Department that the property had been purchased and that the Town was investigating the feasibility of creating a golf course on the property[3]. . . .
 16. On June 4 and July 13, 1999, the Department notified the Town that a permit is required to change the use of the property, even though the property is not part of the watershed that protects the Town's water supply. . . .
(ROR, Volume I, Proposed Memorandum of Decision, pp. 8-9.)
Based on these factual findings, the hearing officer concluded that the Town had failed to prove that it was factually not a water company. The delegation by the Town to a water division" does not eliminate the Town's "absolute authority and control." (ROR, Volume I, Proposed Memorandum of Decision, p. 11.) Further, the hearing officer determined that General Statutes § 25-32 et seq. applied to the Town, making it by law "a water company as unambiguously defined in the subject statute." (ROR, Volume I, Proposed Memorandum of Decision, p. 13.) The hearing officer recommended that the Department rule that the property of the Town was subject to the jurisdiction of the Department as "water company land" located on a public drinking water supply watershed. (ROR, Volume I, Proposed Memorandum of Decision, p. 14.)
After allowing for exceptions to the proposed decision, the Department, on August 30, 2000, issued its final decision adopting, except for a minor correction, the hearing officer's proposed decision. The final decision contained the following comment: "[T]he Department CT Page 12347 would not have jurisdiction over the property if it had been purchased by a private entity that is not a water company. In this case, however, the property was not purchased by such a private entity. It was purchased by a governmental body that is also a water company; and, such entities have special duties and responsibilities to the public, as provided by statute." (Emphasis in original.) (ROR, Volume I, Final Decision, p. 3.) The Town has appealed from the final decision of the Department.[4]
The standard of review for administrative appeals involving statutory interpretation has been set forth in Bridgeport Hospital v. Commission onHuman Rights Opportunities, 232 Conn. 91 (1995): "We recognize our usual rule of according deference to the construction given a statute by the agency charged with its enforcement. . . . Deference may be appropriate when the issue is the application of general statutory language to a particular fact-bound controversy. As we have stated many times, the factual and discretionary determinations of administrative agencies are to be given considerable weight by the courts . . . however, it is for the courts, and not for administrative agencies, to expound and apply governing principles of law. . . ." (Brackets omitted; citations omitted; internal quotation marks omitted.) Id., 109. "Although the court may not substitute its own conclusions for those of the administrative board, it retains the ultimate obligation to determine whether the administrative action was unreasonable, arbitrary, illegal or an abuse of discretion. . . . "(Citations omitted.) United ParcelService, Inc. v. Administrator, 209 Conn. 381, 385-86 (1988); CadlerockProperties Joint Venture, L.P. v. Commissioner Env. Protection,253 Conn. 661, 669 (2000) (while due deference is to be given to the construction given by agency, interpretation of statutes is ultimately a question of law for the court.)
Under the test stated above, the Town cannot easily, and apparently does not, contest the factual finding by the hearing officer that the Town's "water division" is not a separate entity from the Town. (ROR, Volume I, Proposed Memorandum of Decision p. 9, ¶ 11.) Rather, the water division is a Town department, identical to such departments as finance, public works or public safety. (ROR, Volume I, Exhibit-Petitioner 1, pp. 195-96.)
Instead, the Town is contending that the applicable statutes construed as a whole do not extend regulatory powers to the Department where the Town purchases land containing water resources, as opposed to land purchased directly from the segregated funds of its water division.[5]
The statutes explicitly make the Town a water company subject to the Department's regulation. Under General Statutes § 25-32a, water company "means any . . . municipality . . . which owns, maintains, operates, manages, controls or employs any pond, lake, reservoir, well, CT Page 12348 stream or distribution plant or system that supplies water to two or more customers or to twenty-five or more persons on a regular basis. . . ." (Emphasis added.) Further, under General Statutes § 25-32 (a) and (b), the Department has jurisdiction over water companies and may require a permit for any change of use of any watershed lands.
The Town reads this statutory language to implicitly exclude land purchases made directly with Town funds, as opposed to land that is purchased by the water division. "[I]n the case of a municipally owned water utility the statutes apply solely to the utility and not the municipality at large." (Brief of the Town of Wallingford, p. 11.)
This argument ignores the canon of statutory construction that the literal meaning of statutes should normally govern. State v. StateEmployees' Review Board, 239 Conn. 638, 654 (1997); 2A N. Singer, Statutes and Statutory Construction (6th Ed. 2000) § 46.06, p. 181. "We presume that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions. . . ." (Citations omitted.) Hall v.Gilbert Bennett Mfg. Co., 241 Conn. 282, 303 (1997).
The Town's compartimentalization of its role as a water company — so that there is "town land" and "water division land" — does not find support in the law. "[W]here the economic enterprise is one, the corporate forms being largely paper arrangements that do not reflect the business realities, the court should deal with the realities. . . ."[6] (Citations omitted.) Hartford Steam Service Co.v. Sullivan, 26 Conn. Sup. 277 (1966); see also Commission on Hospitals Health Care v. Lakoff, 214 Conn. 321, 333 (1990) (warning that such "Balkanization" will undercut an area of service for Connecticut's citizens). In order not to frustrate the purpose of the legislation, the Town and its departments' land holdings have to be treated as one and the same. General Telephone Co. of Southwest v. United States, 449 F.2d 846,855 (5th Cir. 1971); United States v. Kayser-Roth Corp., Inc.,103 F. Sup.2d 74, 84 (D.R.I. 2000).
The Town argues that this interpretation leads to an illogical result. According to the Town, it would possibly have to include in the department-mandated water supply plan[7] schools, fire stations, the police department and even the town hall. The Town misreads the regulation on water supply plans. Section 25-32d-1a(38) of the Regulations of Connecticut State Agencies and General Statutes § 25-32d, establishing water supply plans, both refer to the definition of water company contained in General Statutes § 25-32a that includes a municipality. Further, the regulation defines "source of supply" as "any well, spring, reservoir, stream, river or other location where water is CT Page 12349 siphoned, pumped, channeled or withdrawn for water supply purposes. . . ." Regs., Conn. State Agencies § 25-32d-1a(31). Thus, the Town would not have to list any source in its water supply plan where the source is not being pumped for water supply purposes. In addition, as the Department argues, no harm would flow to the Town from the Town's setting forth in the plan local properties that fall into class I or II of General Statutes § 25-32, even if this meant listing any and all Town parcels. Rather, the intent of the legislature to protect the purity and availability of water would be enhanced.
The other sections relied upon by the Town are also not on point. Section 22a-358 (c) of the General Statutes does not apply to sales by the municipal water company. It applies to acquisitions by the Department of Environmental Protection ("DEP") of water utility lands. Such purchases by DEP are not to be sold subsequently without the permission of the Department. This statute does not support an argument that any municipal property cannot be sold without the permission of the Department. Sections 25-33b-1, 25-33b-3, and 25-33b-4 of the Regulations of Connecticut State Agencies relate to grants to municipal water companies. As indicated, the water company must hold its funds separately from the general fund of the municipality. Thus, there is no inconsistency between the conclusions of the hearing officer and the fact that grant proceeds are to be sought in the name of the water division, and not by the Town.
The Town also contends that the legislative history for Public Acts 1977, No. 77-606 (House Bill No. 6272) supports its position on the jurisdiction of the Department, and at its request the entire text of this legislative history is included in the record. This legislation, among other things, established the classification system of General Statutes § 25-37c[8], subjected under General Statutes § 25-32
change of use of class I and class II water company lands to the control of the Department, and put in place a two-year moratorium on sale or development of water company land, General Statutes § 25-37a.
The Town points to two items in this legislative history. First, it relies on the statements that this legislation was drafted primarily to solve a perceived crisis that the private water companies were planning to sell water lands to private developers. (See, e.g., Supp. ROR, p. 5856.) Second, the Town sets forth an exchange at the public hearing conducted by the environment committee where Representative Allyn inquired of Sally Richards, the Chairwoman of the Connecticut Council on Water Company Lands: "How do we address these lands that are not owned by a utility, but yet are class I?" (ROR, Volume I, p. 27.) Richards responded: "This is a long and sticky problem. We felt that it needed separate consideration" from this legislation. (ROR, Volume I, p. 27.) CT Page 12350
Neither of these statements indicate that the legislature was not including all municipal lands in the definition of "water company." The legislation on classification was also passed to control municipal use of class I and II properties. Further, the hearing officer made findings that the Town is a water company and the Cooke property is now owned by the water company. This is not the situation Representative Allyn raised where a private party owns class I or class II property near the water company lands.
In addition, Representative Allyn subsequently referred not only to "municipally owned utility companies," as the Town contends, but also to "municipally owned water operations" and "municipally owned services." (ROR, Volume I, p. 78.) Representative Allyn concluded: "I think if we are to provide uniformity either in land use or in the protection that we're going to offer consumers, that we must have a uniformity whether it be a municipally owned, privately owned or whatever." (ROR, Volume I, p. 79.)
The statement of Senator Hudson captures the direction of the General Assembly in passing this legislation: "I don't know what deminimis (sic) means and I don't know that anybody else knows what deminimis means, but I would suggest to this circle that de minimis today might be significant tomorrow. And I think that's the reason for including all the land included in Class 1 in the file copy of this bill. It is because our expertise may not be that expert when we find in the future toxic materials that the land will not filter out unless there is an awful lot of that land available; that there may be carcinogens, that there, indeed, may be things that filtration systems cannot adequately handle but that the land itself can handle. This, indeed, may be an environmentalist bill. It may [err] on the side of safety. But I would rather run that risk than [err] the other way . . ." (Supp. ROR, p. 4198.)
The Town has not discussed other relevant legislative history. In 1967, the General Assembly first authorized the establishment of municipal waterworks. Public Acts 1967, No. 67-780, now codified as General Statutes § 7-234. On the floor of the House of Representatives, it was stated that the bill would "authorizemunicipalities to acquire existing private water supplies systems if the owners of such systems wishes to sell them which power the municipalities do not have. Over the past years whenever towns have wanted to purchase privately owned water supplies they had to come to the legislature with bills for specific legislation for permission to do that. Such special legislation would not be necessary in the future. . . ." (Emphasis added.) 12 H.R.Proc., Pt. 8, 1977 Sess., p. 3345. CT Page 12351
At the same time, the legislature was reacting to a study of the legislative council that recommended that two definitions be added to the statutes, one that placed regulation of private water companies under the Department of Public Utility Control and the other that defined "water company" to include a municipality. Conn. Joint Standing Committee hearings, Public Utilities, 1967 Sess. The later definition was intended to give the Department more control over purity and the adequacy of supply. Id. at 11. The legislation as passed became Public Acts 1967, No.67-691, §§ 1, 2 and 3; see also General Statutes §§ 16-1 (10),25-32a, 25-32, 25-33, and 25-34.
Based upon the above considerations, the appeal is dismissed.
Henry S. Cohn, Judge